HART BROS. ET AL., APPELLEES, V. OTTO H. DOGGE ET
AL., APPELLANTS.

[FILED JULY 11, 1889.]

1. **Creditor's Bill**: HUSBAND AND WIFE : EVIDENCE. In an action in equity, in the nature of a creditor's bill to subject certain property held in the name of a wife to the payment of debts of one who conveyed property in fraud of his creditors to her husband, the defense being that the property was the separate estate of the wife derived from her parents, *held*, that there being a conflict of testimony on that point and doubt as to such separate estate, the judgment of the trial court finding against the same would not be set aside.

2. **Fraud**: INCREMENT: CREDITORS NOT ENTITLED TO. Where property, which has been purchased with money held in fraud of creditors, advances in value beyond the legal rate of interest, the creditors, nevertheless, in subjecting the property, will be restricted to the purchase price with legal interest thereon.

APPEAL from the district court for Lancaster county. Heard below before CHAPMAN, J.

*Billingsley & Woodward, H. J. Whitmore,* and *J. B. Strode,* for appellants, cited : Freeman on Judgments, sec. 319 ; Bigelow on Estoppel p. 45 ; *Truesdell v. Searles,* 104 N. Y., 164; *Clemens v. Brillhart,* 17 Neb., 336 ; *Ransom v. Schmela,* 13 Id., 77; Jones on Chattel Mortgages, 245 ; Bispham's Eq. Jur., 52 ; *Estes v. Wilcox,* 67 N. Y. 264 ; Rogers on Expert Testimony, sec. 135, p. 186.

*Pound & Burr,* for appellees, cited: Wait on Fraudulent Conveyances, secs. 26, 27, 28, 44 ; *Lathrop v. Bampton,* 31 Cal., 17; *Clements v. Moore,* 6 Wall., 315, 316 ; *Phipps v. Sedgwick,* 95 U. S., 3 ; Story's Eq. Jur., sec. 1258 ; Perry on Trusts, secs. 217, 828, 829 ; *Winchester v. Charter,* 102 Mass., 275, 276 ; *Kempner v. Churchill,* 8 Wall., 364.

MAXWELL, J.

The plaintiffs recovered certain judgments against one C. G. Herold, and executions having been issued thereon were returned unsatisfied. An action in the nature of a creditor's bill was thereupon brought against the defendants, and on the trial findings and a decree were rendered as follows:

"The court finds for the plaintiffs generally, and that the allegations of said petition are true, and that the said Hart Bros., at the January, 1885, term of the said county court, recovered said three judgments against said defendant, Christian G. Herold, in the sum of one thousand five hundred fifty-three and $\frac{80}{100}$ dollars debt, and $15.20 costs of suit.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"That at the time of and prior to the commencement of this action the said Christian G. Herold was and is wholly insolvent and unable to pay his debts, and that on or about the 1st day of November, A. D. 1884, the said defendants, and all of them, entered into a confederation and conspiracy to cheat, swindle, and defraud all of said plaintiffs and creditors of the said Herold, and for that purpose and for no other consideration said Herold commenced to pay over and did pay over to the said Otto H. Dogge large sums of money and property, amounting in all to upwards of fifteen thousand dollars, which money having been kept by said Otto H. Dogge and Bertha Dogge, his wife, until the 30th day of March, 1886, said Otto H. Dogge and Bertha Dogge did on said day purchase with said money from one Alfred Irwin the property in dispute in this action, described as that part of subdivision fifty-four (54) of S. W. Little's subdivision of the west half of the southwest quarter of section twenty-four, in township No. ten (10) north, of range six (6) east, of the sixth (6) principal meridian, in

17

Lancaster county, Nebraska, and more particularly described as follows: Beginning at the southwest corner of said subdivision fifty-four, thence east on the north line of P street in said city one hundred (100) feet, thence north and parallel with the east line of Grand avenue one hundred and forty-two (142) feet, thence west one hundred, (100) feet to said Grand avenue, thence south and along, the east side of said Grand avenue one hundred and forty-two, (142) feet to place of beginning, and took said conveyance in the name of Bertha Dogge, wife of said Otto H. Dogge, for the purpose of hindering, delaying, defrauding, and cheating the said plaintiffs, said money being paid to said Irwin out of the moneys given to said Bertha Dogge and Otto H. Dogge as aforesaid, and which property is now occupied by said parties and claimed as their homestead.

"The court further finds that the said deed of date March 30, 1886, of Alfred Irwin and wife to the said Bertha Dogge, conveying to her the said premises as set forth in the petition, was made with the intent to hinder, delay, cheat, and defraud the plaintiffs, the creditors of the said Christian G. Herold, all of which the said Bertha Dogge and Otto H. Dogge had full knowledge at the time of receiving the same, and that the payment made to the said Irwin was made out of the money received by said Bertha Dogge and Otto H. Dogge from the said Christian G. Herold.

"It is therefore considered by the court that the deed described in the said petition, from Alfred Irwin and wife to the said Bertha Dogge, from the premises above described, and the same is hereby adjudged and decreed and declared to be held in trust by the said Bertha Dogge for all of said plaintiffs and that said property may be subjected to the payment of the debts set forth in the petition, and that the sheriff of Lancaster county is directed to proceed as upon execution to sell said property and pay the proceeds thereof over to said plaintiffs as herein decreed, and

that the defendants pay the costs of this action taxed at $415.10."

The testimony tends to show that about the year 1882 Dr. Dogge removed to Plattsmouth, in this state, and opened a small drug store and remained at that place about a year, when he removed to Lincoln; that while residing at Plattsmouth he became very intimate with C. G. Herold, a merchant there; that after Dogge removed to Lincoln he urged Herold also to remove to Lincoln; that principally through his efforts Herold did remove to Lincoln in 1883 and opened two stores there; that during 1884, and prior to December 25th of that year, Herold had contracted debts for goods to a very large amount, estimated by some of the witnesses at $45,000, and Herold himself at about $38,000; that there was an attempt on the part of Herold at least to place a considerable portion of his goods beyond the reach of his creditors; that during all this time Dogge was the confidential friend of Herold, and professed to be able to effect a compromise of his debts at twenty-five cents on the dollar. To accomplish this purpose, Herold about the 25th of December, 1884, gave Dogge $9,600, and he already owed Herold $400, and had previously received considerable sums. Dogge thereupon went to Chicago, when he wrote to Mrs. Herold a letter in German, which is translated in the record as follows:

"CHICAGO, February 22nd, 1885.

"VERY HONORED MRS. HEROLD: I arrived at Dixon and here at Chicago safe, but I couldn't do anything for Mrs. Robertson and her children, as they asked $2,000 for the lot and don't know yet if she sells, so I have concluded to let the lot matter go as long as I can. As I meet here a few good old friends which are going to New Orleans, and they persuaded me into going along; so I have concluded, as I feel so very bad now, to go along with them, but I shall only stay a short time, and from there at once to New Mexico, and on this trip to contemplate what is

necessary for you and I. Now, as to how I feel; now I cannot exist, as I am getting worse and I want rest. I also pray to you not to trouble yourself, and in no way be afraid to be before the court, as you are innocent of everything and don't know nothing, and Charlie neither; now you will stay on this truth that your husband never explained anything to you about his business, and you never asked him anything about it, and you always signed the papers that your husband laid before you, and that money what you received from Shafer with that will your husband commence business and the money your husband had taken along to New Mexico.

"If you stay by this truth then you can have no trouble, and don't let the words be changed. I would like to be there from the wish of my heart, as long as the court is in session, but am feeling so bad that I am afraid I'll get worse sick, and then I couldn't stay by you at all, and then we must not often be together as long as the court is in session, as they might make me a big trouble, which I didn't deserve, especially if they found out that your husband is gone. I shall hunt up Mr. Herold and shall guide everything for your best and come back when the court is over. Now I pray to you, again, honored Mrs. Herold, don't trouble yourself; everything will go better than you think. Dear Charlie, stay by your dear mamma and try and make it easy for and gladly humor her, and hope that when I come again to meet you all well and not forsaken. I will hunt up the Jew in St. Louis if I find him so as to get that money. I pray to you me to answer immediately to New Orleans. I will call at the post for the letter.

" Heartiest regards an all to all.

"I remain your friend,

"O. H. Dogge."

There is testimony in the record tending to show that he had promised to purchase a certain lot for Mrs. Herold and also that he promised that he would meet Mr. Herold

in New Mexico when they would engage in business there; that in pursuance of this arrangement Herold went to Las Vegas, N. M., and stayed there a long time, expecting Dogge on every train.

Dogge seems to have failed to compromise the debts, or any of them, if indeed he made any effort to do so, and soon after went to Europe, where his wife and children had preceded him; that Dr. Dogge received a large amount of funds belonging to Herold for which he gave no consideration is proved beyond question, and as against creditors of Herold he is a trustee for the amount so held. But it is said that the property in question was purchased with the money of the wife, and therefore she is not chargeable. It does appear that from 1872 to about the year 1876 or 1877, while the doctor resided in Wisconsin, she was possessed of some money and loaned the same; but the testimony also shows that she was quite a traveler and there is but little tangible proof of her possessing means after that time except as hereinafter stated. On the other hand, Dr. J. Massman testifies that he was acquainted with Dr. and Bertha Dogge at Mayville, Wis., in 1880 or 1881; that he had several conversations with Bertha Dogge, who stated "that she had hardly any money at all;" that if they could sell their house, on which there was a mortgage, they could get together perhaps $600 or $800.

Dr. Schoen, of the same place, testifies that the house in question was sold for about $400; that when Dr. Dogge came to Mayville in 1879 his wife was in Europe; that upon her arrival in New York she telegraphed to her husband for money to pay her expenses to Wisconsin and that thereupon Dr. Schoen telegraphed his correspondent in New York to pay her $25.00, which was done. He also testifies that after the return of Mrs. Dogge he had several conversations with the doctor and his wife, and that he knew from conversations with both of them "that they were

as poor as a church mouse." These gentlemen are disinterested witnesses and apparently friends of the family and familiar with their circumstances, and their testimony apparently is perfectly reliable. A number of witnesses in this state who were acquainted with the Dogges after their removal here were called as witnesses. M. A. Hartigan testifies that Mrs. Dogge stated to him and Mrs. C. G. Herold, in the city of Lincoln, shortly before the bringing of this action that "she must get all she could out of them (the Herolds), because what she got out of them was all she had in the world."

In this he is corroborated by Mrs. C. G. Herold.

Mrs. Herman Herold testifies that while Dr. Dogge and his wife lived at Plattsmouth she had a conversation with Mrs. Dogge in which she stated "that she had such a hard time of it," in the way that she had to get along financially.

Lena Halen testifies that about the year 1884 she had frequent conversations with Mrs. Dogge about her financial condition, and that "she talked as though she did not have very much."

William Morris testifies that after the trial and acquittal of Dr. Dogge, on the criminal charge, he was standing on Eleventh street, nearly opposite the cigar store between N and O streets, and Dr. Dogge and some gentlemen were standing talking, and Mrs. Dogge rode up in a buggy. They shook hands, he helped her out of the buggy, and said, "Mr. Herold has gone up (he was convicted), we have got his money and don't care where he goes."

Judge S. W. Lamoreaux, of Mayville, Wisconsin, testifies that he had resided in Mayville thirty-five years, and was county judge of Dodge county, Wisconsin; that he was acquainted with Dr. Dogge and wife; that before Dr. Dogge left Mayville he had a conversation with him "in reference to his business affairs. From the conversation I had with him and my knowledge of his affairs, I would

judge he had about from $500 to $800, which did include his house and lot. I did know Mrs. Bertha Dogge, his wife. To my knowledge his wife, Bertha, had no property. She came to me for assistance, stating that she wanted some money till she heard from her husband. My recollection is the doctor was gone. It was after the doctor ceased business here."

There is a large amount of testimony to the same effect, which if referred to would extend this opinion to too great length, but at every place where the doctor resided—at Milwaukee, Fond du Lac, Mayville, Marshville, and Plattsmouth—he seems to have been in straitened circumstances. Reliable, trustworthy, disinterested witnesses considered them poor, and it was not until they met Herold that they began to exhibit signs of wealth. Acts speak more potently than words, and circumstances are more reliable than mere assertions. All the outward indications were that these people were poor when they moved to this state. The doctor has changed his residence too often to build up a lucrative business at any place where he has resided since coming to this country in 1872. It is true that there is in evidence what purports to be a book of original entries of his business from June 27, 1884, to February 17, 1885, in which the charges amount to a very large sum. This book is remarkable for the uniformity of the entries, in color of the ink, style of writing, and general appearance, as though written up within a few days. That the same kind of ink should have been used during a period of nine months is not out of the ordinary course, and that the entries should be made with the same pen where a non-corroding one is used, but that there should be no change in the penmanship, through all the climatic conditions affecting the human frame, is remarkable. The doctor, however, testifies on cross-examination that the entries were made as they occurred, with different pens of the same kind—steel pens, apparently. Mrs. Dogge and several witnesses tes-

tify that she had about $7,000, in cash, when she came to Lincoln. This money was kept in no bank or other reliable depository, nor in any place where the fact of its existence could be established, but the proof depends alone upon assertions, which are strongly disproved by circumstances. There is a direct conflict in the testimony of the witnesses in this case, and it is evident that some of them have deliberately sworn to what is untrue. The trial court having passed upon the weight to be given to the testimony of the several witnesses, most of whom testified before it, this court cannot reverse its judgment unless it appears to be clearly wrong, which is not the case. This court will, as far as consistent with good faith to creditors of her husband, or creditors who have been defrauded by him, protect the rights of the wife in the enjoyment of her separate estate; but in order to do this it must be proved that there was a separate estate belonging to her which was seized for the debts of another. In this case, however, there is too much doubt about the separate estate of the wife to entitle her to relief. It is fully shown that a large amount of Herold's property passed into their (the Dogges,) hands and that no consideration was paid for the same, and that the creditors of Herold were thereby prevented from recovering their just dues. That the property in dispute was derived from the proceeds of the Herold property transferred to the Dogges is clearly apparent, and it should be applied to the payment of such creditors. The judgment therefore in that regard should be affirmed. The property, however, is shown to be of much greater value than $8,500, there having been a considerable increase in value since the purchase. This increase in speculative value the creditors of Herold are not entitled to. In other words, they are entitled to the amount invested with legal interest thereon, and not to money made by speculation in excess of the legal interest.

The judgment of the district court will, therefore, be

modified to subject the property to the amount of $5,000, with interest thereon at seven per cent per annum.

JUDGMENT ACCORDINGLY.

COBB, J., concurs.

REESE, CH. J., dissenting.

I am unable to agree to the conclusion arrived at in this case by my associates, and will very briefly give my reasons therefor.

I agree that there is sufficient evidence to sustain the finding of the district court, that the Herolds and Otto H. Dogge entered into a conspiracy, the purpose of which was to defraud the creditors of C. G. Herold, and, did the evidence as clearly, or even to any degree, connect Bertha Dogge with the transactions which are alleged to have occurred between the Herolds and Otto H. Dogge, the decree of the district court would have to be affirmed. It is true that Otto H. Dogge in his testimony contradicts every material statement of the Herolds which tends to connect him with any fraudulent purpose on their part, but there is ample evidence to sustain the finding of the trial court that the facts were substantially as stated by Herold; but as the real contest is with Mrs. Dogge, that part of the case need not be further noticed.

In reading the bill of exceptions my attention is directed to what seems to me to be a clear want of evidence connecting Bertha Dogge with the transactions between her husband and the Herolds; and also a clear want of evidence to sustain the finding that the property in question, which seems to have been purchased by and deeded to Bertha Dogge, was purchased with the money derived from any transaction with Herold. It is shown by her, and her testimony is corroborated, to some extent, by certified copies of public records in Germany, that after

her marriage with Dogge and when she came to this country she brought with her some $4,000 in money ; that at Hamburg, before crossing the ocean, she procured her money to be exchanged and converted into the money of this country.

On their arrival at New York they remained there a short time and, before settling in Wisconsin, they visited and remained some time in Baltimore, Philadelphia, other portions of Pennsylvania, and in Chicago ; that during this time she had carried her money with her and kept it from the possession of her husband ; that they first settled in Milwaukee, Wis., and after remaining there some time, removed to Fond du Lac. During this time she was advised to invest her money in United States bonds, when she purchased two $1,000 six per cent bonds and four $500 five per cent bonds ; that after some time she was informed that the six per cent bonds had ceased to draw interest, owing to their having been called for payment ; that she then disposed of all the bonds and placed the money and its accrued interest in the hands of a Mr. Allinger, to be loaned. It seems from her testimony, and that which is introduced for the purpose of corroborating her in that particular, that she did not place all the money with Mr. Allinger at once, but that she went to his office and there, upon his recommendation, loaned the sum of $1,500 upon an assignment of a real estate mortgage, $100 in some other method, and left with Mr. Allinger the sum of $400, which he soon thereafter loaned to other parties ; that afterwards he negotiated loans for her to the extent of the other $2,000 which was furnished by her ; that after remaining in Wisconsin for some time, a part of which was in Mayville and a part in Marshville, her husband, Otto H. Dogge, came to Plattsmouth with a view of locating there, and wrote to her to dispose of their property and follow him. She then notified Mr. Allinger to collect the money which had been loaned by him, together with its interest ;

and in about two months from that time he collected the money due her, with which, and the money she had received for property which she had sold, she came to Nebraska, bringing with her about $7,000. Their residence in Wisconsin extended over a number of years, perhaps from the year 1872, the time of their arrival in Wisconsin, until the year 1887, the time of their removal to this state. During this time she had been a portion of the time in Europe and the business of loaning her money had remained in the hands of Mr. Allinger; that after she came into this state she had allowed her husband to make use of her money, but that a short time prior to a contemplated return to Germany she had insisted upon her money being returned to her, but that it was not done; that about the month of June, 1884, she returned to Germany, where she remained until in January, 1885, when she was joined by her husband; that she then informed him that she must have her money returned to her; but that he insisted that he had not the money to pay, but would transfer to her certain notes which she could collect upon her return to this country; that these notes were received, and after her return she collected them, giving the names of all the persons who had signed the notes and from which the claims were made. The names and amount of the collections are given in her testimony. The amounts range from $23 to $1,000, the total amount being nearly $6,000. This money, so collected, was used in the purchase of the property in question, the purchase price being $8,500, of which $5,000 was paid in cash. Throughout her testimony, which was quite lengthy, she adhered to these statements, and denied all knowledge of, or complicity with, the fraudulent action of C. G. Herold. For the purpose of disproving her statement it is shown that upon many occasions she denied having any money, and insisted that she was in need. The evidence of various bankers in Fond du Lac, and elsewhere, perhaps, was taken for the

purpose of showing that she negotiated the sale of no government bonds through them. The evidence of the recording officer of the county in which she resided was taken showing that the records of the county failed to show any transfer of mortgages to her. But he also testified that in many instances the assignments of mortgages were not presented for record until their payment, when the assignment and satisfaction were presented together. We also observe that in his testimony he refers to mortgages as being upon record executed by and to the same persons named by her, but that they did not show to have been transferred. The evidence of Mrs. Dogge and others having knowledge of the facts shows that the money loaned by her, upon the assignments named, was paid by the borrower, and the assignments returned, so that her testimony might be true and yet the facts of the assignment not appear upon the records. Mr. Allinger, his wife, and daughter, with whom Mrs. Dogge appears to have been well acquainted, all testified that at the time of Mrs. Dogge's departure from Wisconsin to come to this state she went to Mr. Allinger's house, closed up her business with him and received her money, and that prior to her departure they assisted her in counting the money which she had in her possession, which amounted to $7,000, and which she testified she brought directly to this state. These facts, when taken in connection with what seems to me to be an absolute want of any proof connecting her with the alleged fraudulent transactions of the Herolds and Dr. Dogge, and the failure to trace any of Herold's money or property into her hands, impress me with the belief that the decree should be reversed.