HART ET AL., APPELLANTS, V. DOGGE ET AL., AP-
PELLEES.

[FILED MARCH 26, 1890.]

Stare Decisis. The former decision in this case, reported in 27 Neb., 256, adhered to.

ON rehearing.

*Billingsley & Woodward, J. B. Strode,* and *H. J. Whit-more,* for appellants.

*Pound & Burr, contra.*

NORVAL, J.

The appellees commenced this suit in equity in the nature of a creditor's bill for the purpose of subjecting the property in controversy to the payment of the debts of C. G. Herold. The findings and decree of the district court were for the plaintiffs and the defendants appeal. At tl e January term, 1889, of this court the decree of the lower court was modified. (27 Neb., 256; 4 N. W. Rep., 1035.) At the request of the defendants a rehearing was allowed and the cause is again submitted for our consideration.

It is not seriously contended by the defendants that the evidence does not sustain the decision of the trial court in finding that the defendants, C. G. Herold and Otto H.

Dogge, entered into a conspiracy for the purpose of defrauding the creditors of said Herold. Not being urged to a reconsideration of that branch of the case, we will pass it with the remark that we find ample testimony in the bill of exceptions to sustain this finding of the district court.

Counsel for the defendants urge with considerable zeal that the evidence does not in any manner connect Bertha Dogge with the said fraudulent transactions. In our view this point of the case is practically settled against the defendants when it is established that a conspiracy was formed by Herold and O. H. Dogge to cheat Herold's creditors, and that in furtherance of that fraudulent purpose the money was paid by Herold to Dr. Dogge. For if the money was received by Dogge for that purpose, then it is evident that it was not received in payment for money borrowed of Dogge, as claimed by the defendants. It is probably true that Mrs. Dogge had no part in planning or forming the conspiracy, because she was at the time in Germany. If the testimony of the plaintiff's witnesses is true, she became an active participator in the scheme after her return from Europe. To subject the property in controversy to the payment of the claims of plaintiffs, it is of course necessary to establish that it was paid for with Herold's money. It is true that no witness has testified that the consideration paid to Irwin for the property was a part of the money received by Dr. Dogge from C. G. Herold. The creditors contend that the circumstances show that the money came from Herold. The defendants insist that the property was paid for out of Mrs. Dogge's own funds. Mrs. Dogge testifies that when she came from Germany, in 1872, to Wisconsin, that she brought with her some $4,000 in money, which she claims to have received from an estate; that while in Wisconsin she claims to have converted it into United States bonds, and afterwards she reconverted the bonds into money, which was loaned for her by one

Allinger, and that when she came to Plattsmouth, Nebraska, to live in 1881, she brought this money with her, amounting to some $7,000. She is corroborated by the testimony of Allinger and his daughter. The Dogges claim that after they came to this state to reside, Dr. Dogge handled his wife's means for her, loaning the most of it to C. G. Herold without security, and that in July, 1884, when Mrs. Dogge started on a visit to Germany Herold had some $8,000 of her funds.

There is considerable testimony in the bill of exceptions tending to show that the Dogges, while in Wisconsin, did not reside long in a place; that the greater portion of the time they occupied rented rooms, bought flour by the pound, accepted gifts of groceries and clothing from their more fortunate neighbors, and when they came to Nebraska they left behind unpaid store bills, which yet remain unpaid. Dr. Shoen testifies that when the Dogges moved to his town he advanced the means with which to purchase a stove and necessary household furniture; that they lived up to their income and accumulated no property. From the testimony of Dr. Massman, R. Sanbering, Judge Lamoreaux, Anthony Rothgery, Mathias Kommers, and others, who were well acquainted with the Dogges when they resided in Wisconsin, it appears that the Dogges had no property except a small house not worth to exceed $800, an old horse and buggy, and a few household goods. The house was incumbered. Mrs. Dogge sold it just before coming to Nebraska for $450 above the incumbrance. F. Krumme testifies that he knew the Dogges well in 1876, when they resided in Fond du Lac, and was well acquainted with their circumstances, and that they had no property. He further testifies that Mrs. Dogge told him that she had no money. Tracy Grumbech testifies that when the Dogges resided in Fond du Lac they had no money; that she let them have goods for which they never paid, and that Mrs. Dogge tried to borrow money of her.

If the testimony of these disinterested witnesses, who had means of knowing of the financial condition of the Dogges, is true, then the testimony of Dogge and his wife as to the amount of money she had in her own right when she arrived in Nebraska is incredible. It is certain that if she did not bring with her to Plattsmouth $7,000 in money, as she claims, then she did not have the money to loan to Herold; and it follows that it was not her means that paid for the property in controversy. If Mrs. Dogge was possessed of the money she claims, it is indeed strange that she deposited no part of it in any bank, either in Wisconsin or Nebraska.

The testimony of Mrs. Herman Herold and Lena Halen is to the effect that Mrs. Dogge had stated frequently since coming to Nebraska that she was in straitened circumstances financially. Lena Halen further testifies that she heard Mrs. Dogge say in 1884, "If she, Mrs. Dogge, had enough money to support herself and family she would leave the doctor and not live with him any longer." Mr. Hartigan testifies that Dogge told him after the failure that he had received from Herold some $10,000, which he was to use to force a compromise with Herold's creditors. C. G. Herold testifies that he gave Dogge the money for that purpose. He further states that Mrs. Dogge told him that her husband had informed her all about the money, and when he came back he would make it all right. There is in the record other testimony tending to show that the Dogges had but little means when they came to this state, and that the money received by Dogge from Herold was obtained in pursuance of the conspiracy entered into to defraud the creditors of Herold. It is evident that outside of the money received from Herold the Dogges did not have the means to purchase the property in controversy.

Mrs. Dogge testifies that after the Herold failure she met her husband in Berlin and demanded her money. He

Hart v. Dogge.

replied that he had no money and then gave her over $6,000 in notes. It is claimed that with the proceeds of these notes she paid for the property in dispute. It will be remembered that Dr. Dogge had a short time before meeting his wife in Berlin received from Herold nearly $10,000, yet at the time it is alleged that he turned over to his wife these notes he claimed to have no money. The record is silent as regards what he had done with the most of the funds received from Herold. Several witnesses testify to having heard admissions made by Herold to the effect that he was indebted to Dogge. It is disclosed, however, that the most of these admissions were made after the conspiracy to defraud was entered into, and while Herold was trying to make it appear as if the transaction between him and Dr. Dogge was an honest one. The Herolds testify that C. G. Herold was not indebted to the Dogges; that the notes held by Dr. Dogge were given as a part of the conspiracy, and that they were antedated to give them the appearance of being genuine. To establish the *bona fides* of Herold's notes we are referred to a book in evidence, purporting to be a book of original entries of Dr. Dogge's business from June 27, 1884, to February 17, 1885. If we could convince ourselves that the entries in this book were not made on the same date it would greatly strengthen appellants' case. It is remarkable, too, that this book should contain so faithful a record of the notes received by Dogge from Herold, while it fails to contain any reference to the notes amounting to several thousand dollars which it is claimed Dr. Dogge owned and turned over to his wife in Berlin, and with the proceeds of which she claims to have purchased the Irwin property. It is proper to suggest in this connection that Dr. Dogge fails to testify to the delivery of the notes to his wife. Her testimony in that regard stands alone.

It is contended by the appellants that Mrs. Dogge's testimony about paying for the property in controversy with

the proceeds of the notes which she claims to have received from her husband stands uncontradicted. While her testimony is not in terms disputed by any witness, yet there was sufficient evidence before the trial court, if believed, to warrant it in refusing to give any credit to her testimony except wherein she is corroborated by the evidence of some credible witness. If the Dogges had but little means of their own, as has already been shown, where did she obtain the money to pay Irwin for the property? The only just conclusion is that it was the money which the evidence shows came into Dogge's hands from Herold, and belongs to the latter's creditors. That Dogge received some $10,-000 from Herold is not disputed, and that it was received in pursuance of the conspiracy entered into between Dogge and Herold is established by the preponderance of the testimony.

After a careful examination of the record, covering nearly one thousand pages, we are convinced that there is sufficient evidence to sustain the findings of the lower court upon the main issues, and that the conclusions reached by the majority of this court in the former opinion are correct. The creditors are entitled on the sale of the property to the sum of $5,000, with seven per cent interest thereon from the date of the filing of the petition in the court below. The decree of the district court is modified accordingly.

JUDGMENT ACCORDINGLY.

THE other judges concur.